**BLAZER INSURANCE AGENCY, INC.,**
**Plaintiff–Appellee,**

v.

**JIM COGDILL DODGE COMPANY,**
**Defendant–Appellant.**

Court of Appeals of Tennessee,
Eastern Section.

Feb. 7, 1991.

Permission to Appeal Denied by
Supreme Court May 6, 1991.

Frank L. Flynn, Jr., with Pryor, Flynn, Priest and Harber, Knoxville, for defendant-appellant.

J. William Johnson, with Goddard & Gamble, Maryville, for plaintiff-appellee.

OPINION

SANDERS, Presiding Judge, Eastern Section.

Defendant appeals from a judgment for alleged unpaid premiums on insurance policies canceled by Defendant prior to maturity.

The Defendant–Appellant, Jim Cogdill Dodge Company (Cogdill) is a franchised Chrysler automobile dealer in Knox County. The Plaintiff–Appellee, Blazer Insurance Agency, Inc., (Blazer) is an insurance agency with principal offices in Blount County. In March, 1987, Cogdill and Blazer entered into an agreement for Blazer to furnish Cogdill four insurance policies to cover Cogdill's business operations. There were to be a workers' compensation policy, a garage owner's liability policy, a multi-peril policy, and an umbrella policy. The annual premiums on the policies were $40,190 for the garage owner's policy, $5,247 for the multi-peril policy, and $8,000 for the umbrella policy. The workers' compensation policy is not in dispute on this appeal and the amount of premium is not material to our consideration of the case. The payment of the premiums on all of the insurance except the workers' compensation was to be made in installments. Of this amount Cogdill paid two payments totaling $20,919.31 and the balance of the premiums was to be financed through Premium Service Corporation, for which there were finance charges of $2,499.98.

As pertinent here, under the agreement with Premium Service Corporation (PSC) Cogdill gave PSC the following power of attorney: "I appoint PSC my true and lawful attorney-in-fact irrevocably with full authority to cancel any or all policies listed above in the event of any default in repayment as agreed herein, subject to ten (10) days prior notice mailed to my last known address by PSC of past due payments and of its intent to cancel."

On March 5, 1987, Blazer issued a 30–day binder on each of the policies, with an expiration date of April 6. When the binder expired no renewal binder was issued nor were any of the policies ever given to Cogdill. It appears the policies of insurance were issued by Seibels–Bruce Group and South Carolina Insurance Co. on April 24, 1987, and received by Blazer on April 27

but were never delivered to Cogdill. Cogdill didn't become too concerned about not having the policies until Chrysler Credit, which floor plans approximately $3,000,000 for Cogdill, was conducting an audit of Cogdill and the regional manager for Chrysler Credit told Cogdill, "You need to get your policies for your insurance." At that point Mr. Jim Cogdill told his office manager to get in contact with Harold Shipley, who was the agent for Blazer with whom Cogdill had negotiated for the insurance. Cogdill did not get the policies. During the months of April, May, and June Cogdill contacted Mr. Shipley three or four times about the policies but never did get them. In July Cogdill negotiated with Chrysler to get its insurance through Chrysler. On July 13 Cogdill wrote the following letter to Blazer:

"JULY 13, 1987

"BLAZER INSURANCE COMPANY
220 PETER RD
KNOXVILLE TN 37923

"BLAZER INSURANCE CO:

C

"PLEASE CANCEL POLICY # DOG850 EFFECTIVE JULY 1, 1987.
DUE TO THE FACT WE, JIM COGDILL DODGE COMPANY HAS INSURANCE WITH CHRYSLER INSURANCE COMPANY

"THANK YOU
/s/ Jim Cogdill
JIM COGDILL
PRESIDENT"

---

The copy of this letter in the record shows a "C" penned in above the "D" in the policy number, although DOG850 is correct, and there is no explanation as to why the "C" was added.

It appears Cogdill made no further payments to Premium Service after writing that letter and on September 10 PSC sent notice to Blazer and South Carolina Ins. Co. to cancel the policies for nonpayment of its account. At that time Blazer had not canceled the policies as requested by Mr. Cogdill in his letter of July 13, but upon receipt of the request of PSC Blazer canceled the policies as of August 31, 1987. It appears Blazer and Cogdill could not agree on what

amount, if any, was owed for earned but unpaid premiums on the canceled policies and that precipitated this litigation.

Blazer filed suit against Cogdill in Blount County on a sworn account for $16,314.67 as the deficiency due on the policy premiums.

Cogdill filed a motion to dismiss, saying the suit was a suit in contract, the contract for the insurance was made in Knox County, and Blount County was not the proper venue.

The trial court overruled the motion, holding that if the suit was in contract, the contract was made in Blount County since

the binder for the insurance was executed in Blount County. If the suit was for debt, venue was in Blount County since that was the home office of Blazer where the default occurred.

The principal issues upon the trial of the case and upon this appeal are: (1) Did Cogdill have a justifiable right to cancel the insurance since he never received the policies; (2) Should Cogdill be liable for premiums on the policies until July 13 when he gave notice of cancellation or until August 31 when the policies were canceled; and (3) Should the amount of the premiums be calculated on a daily pro rata basis or carry the "short rate" cancellation penalty.

Upon the trial of the case the court found the issues in favor of Blazer, holding Cogdill was liable for the premiums until August 31 at the short rate for cancellation, and entered a judgment for $15,085.62.

Cogdill has appealed, saying the court was in error and presenting a number of issues for review. The thrust of Cogdill's issues is that the court erred (1) in finding venue was properly in Blount County; (2) in failing to find Cogdill was justified in canceling the policies for failure of Blazer to furnish it policies of insurance and therefore it was not liable for the short rate cancelation penalty; (3) in failing to find Blazer should have canceled the policies in July.

Cogdill insists the court was in error in finding venue was in Blount County. The court found the offer to purchase the insurance was made in Knox County but the acceptance of the offer was in Blount County, which culminated in the contract. We cannot say the evidence preponderates against this factual finding by the court.

■ Cogdill's second issue is the court should have found it was justified in canceling the insurance for failure of Blazer to furnish it with policies and it should not be required to pay the short term premium rate. We agree with Cogdill on this issue. The court filed a finding of fact after taking the case under advisement but he failed to state what consideration, if any, he gave Cogdill's right to cancel the insurance. He

did state: "Plaintiff issued a binder for said insurance on or about March 5, 1987, but never at any time thereafter issued contracts of insurance to the Defendant. However, Defendant paid appropriate insurance premiums directly to Plaintiff, Defendant made claims under the binder for losses sustained and Plaintiff paid said claims to Defendant." The binder became effective March 6, 1987, and expired at 12:01 a.m. on April 6. During this period Cogdill filed four claims which, along with one other claim, were paid. But, other than the 30–day binder, Cogdill had nothing to show it ever had any insurance coverage in effect between the expiration of the binder and his letter to Blazer on July 13 canceling the insurance. Mr. Painter, who was chief executive officer of Blazer, testified the office records indicated Blazer received the policies from the underwriters on April 27 but he had no idea what happened to the policies after that. The policies apparently are still unaccounted for since nothing was offered in evidence to establish their existence. Without these policies there was no way Cogdill could have known what insurance, if any, it had in effect. It could not have known what companies were furnishing the insurance, of what duration the policies were or what restrictions, exclusions, or coverage it had in effect. It was standing naked but continuing to pay premiums. After the regional manager of Chrysler Credit admonished Cogdill to get its insurance policies, Mr. Cogdill's testimony as to what happened was as follows:

"Q. And when this man—this manager called that to your attention, what did you do?

"A. Well, what I did is I called my office manager in and I told her to get in contact with Harold Shipley and get our policies.

"Q. Did you get any policies?

"A. No.

"Q. Did you contact Mr. Shipley?

"A. Yes, I did.

"Q. How many times would you say you contacted Mr. Shipley inquiring about—'Where are our policies?'—let's

say in April, May, June—up until the date you wrote this letter?

"A. I contacted him three or four times.

"Q. What would he tell you?

"A. He said, 'Hey, don't worry about it, you have got insurance—' you know, just 'Don't be concerned about it, I will get your policies to you.'

\* \* \* \* \* \*

"Q. Okay—when you didn't have policies at the end of June what did you do?

"A. Well, I just wrote them a letter and cancelled the insurance.

\* \* \* \* \* \*

"Q. Before you wrote the letter what did you do? In regards to your insurance?

"A. Well, what I did is I got in touch with Chrysler—of course, they had been getting in touch with me about, you know, not having the policies—and when they came in, you know, I just took insurance with them."

We have been cited to no cases, nor have we found any, in this jurisdiction directly addressing the right of an insured to cancel a policy of insurance for failure to deliver the policy. Blazer, in its brief, states: "Several older Tennessee cases hold that delivery of the policies to the agent is constructive delivery of the policies to the insured. *Yonge vs. Equitable Life Assurance Society*, 30 F. 902; *Bates vs. Equitable Life Assurance Company of U.S.*, 177 SW2d 360, 27 Tenn.App. 17; *Tennessee Farmers Mutual Insurance Company vs. Thompson*, 12 Tenn.App. 591; *Tomei vs. Eureka Sec. Fire and Marine Insurance Company*, 4 Tenn.App. 268." A review of these cases reveals that none of them are in point on the issue here involved.

The *Yonge* case involved a life insurance policy. Mr. Yonge applied for the insurance but didn't have the money to pay the first quarterly premium. The agent accepted his note for the premium. Mr. Yonge died after the policy was issued but before it was delivered to him. The insurance company denied coverage on the grounds the first premium was not paid before the insured's death. The court held Mr. Yonge's note was consideration for the premium. Nondelivery of the policy was not an issue in the case.

The *Bates* case did not relate to an issue on non-delivery of a policy. The policy had been delivered to the insured by the agent. The issue in that case was whether or not the premium had been paid. We think, however, the case is enlightening on the duty of the agent to deliver the policy, where the court said: "It is undisputed that the policy was turned over to the agent Ramage early in January 1941 for delivery to the insured. He had a right to demand the policy, the agent was bound to deliver it to him...."

In the *Tennessee Farmers Mutual* case the insured signed an application for insurance and paid the premium. The application directed that the policy be sent to the agent. The policy was issued and sent to the agent but the company requested the agent not to deliver the policy until the consent of another insuring company was obtained. The agent failed to disclose the condition, but instead represented to the insured everything was "all fixed out." The property was destroyed by fire before the policy was delivered to the insured. The insurer defended on the grounds there had been no delivery of the policy. In affirming a judgment for the insured, this court said: "Now if the agent kept the policy without telling the applicant of any condition attached to the delivery and told the applicants that it was all fixed and the insurance was in force, as Mrs. Thompson testified, then they had a right to think that the policy was in the hands of the agent for their benefit and there was a constructive delivery of that policy."

The *Tomei* case involved insurance for Mr. Tomei, an illiterate immigrant who could neither read nor speak the English language. Mr. Tomei trusted a Mr. Barnes, an insurance agent, to procure insurance for him and to keep his property insured. The issue in the case was whether Mr. Barnes could accept the cancellation of a policy on behalf of Mr. Tomei and whether or not a policy issued to replace

the canceled policy and delivered to Mr. Barnes was enforceable when a loss occurred prior to Mr. Barnes's delivering the replacement policy to Mr. Tomei. In sustaining a judgment in favor of Mr. Tomei, this court said: "The facts in the instant case show Barnes had the authority to represent the complainant in all of his insurance matters. The complainant absolutely relied upon Barnes to place the insurance wherever it could be insured."

We think Blazer's reliance upon the cases reviewed above as supportive of its insistence on appeal is misplaced, but generally

> It is usually held that when application is made for a policy of insurance, and the application is acted upon and the contract issued, the act of delivery completes the transaction so as to place into force and effect a binding contract. Thus delivery may be considered to be a necessary condition precedent to the validity of the contract, and possession of the contract by the insured or by the beneficiary raises a presumption of due delivery.... Conversely, where no contract was actually issued or delivered, there is a strong presumption that there was no contract.

Appleman's Insurance Law and Practice, Vol. 1, § 131, Necessity of Delivery, pp. 439–440.

It would be a harsh rule indeed to hold that an insured who had not received his policies after some four months, in spite of numerous requests, could not cancel those policies without paying a short-term premium penalty.

This brings us to the issue of whether the obligation to pay premiums should terminate in July or on August 31. Blazer contends it should not be bound by the letter from Cogdill to it dated July 13 because it never received the letter in its office in Blount County. The letter was addressed to Blazer at its offices located at 220 Peter Road in Knoxville. Blazer moved its office from this address to the Northshore Plaza in Knoxville sometime in June, before the letter was written. The letter was received by Harold Shipley, who was Blazer's agent and the person who sold the insurance to Cogdill. Blazer contends it had terminated its relationship with Mr. Shipley in June, before the letter was sent, and receipt of notice by Mr. Shipley did not constitute notice to Blazer. It also says, since Cogdill's letter did not list the policy numbers of the policies to be cancelled, but said "please cancel policy C # DOG850," that was insufficient description to determine what policies were to be cancelled.

■ We cannot agree with Blazer's insistence. The undisputed proof shows Blazer maintained an office in Knoxville at 220 Peter Road until shortly before the letter was written. This was the location of its office at the time the policies were sold to Cogdill. It was the office occupied by Mr. Shipley and Blazer never notified Cogdill of the change in the location of its office to Northshore Plaza. The proof shows the letter was received by Mr. Shipley at the 220 Peter Road address in July and forwarded by him to Blazer's home office soon after its receipt. The undisputed proof further shows Blazer never notified Cogdill of its termination of its relationship with Mr. Shipley and Cogdill had no knowledge of the termination of that relationship until after the beginning of this litigation. The proof also shows Blazer assigned a computer code number to each of its insurance customers so that, by using the code number, any information needed by Blazer concerning a customer's policy could be pulled up on the computer by putting in the code number. The code number which had been assigned to Cogdill was DOG.850.

Blazer, in its brief, argues: "The Appellant's letter dated July 13th, 1987, says C 'PLEASE CANCEL POLICY # DOG850'. That designation does not identify any of the three policies by name or by identifying number. .... The letter does not make clear what is to be cancelled."

The record fails to show Blazer ever gave Cogdill any information by which the policies could be identified other than its code number of DOG850. By running this code number through its computer Blazer would have had much more information

about the policies referred to by Cogdill than it ever furnished to Cogdill.

 In its brief Blazer faults Cogdill for sending his letter of July 13 requesting cancellation of the policies to 220 Peter Road in Knoxville instead of to Blazer's office in Maryville. It insists that, since Cogdill had sent policy payments and filed claims through the Maryville address, it should have mailed the cancellation letter to the same address. We think, however, from the evidence in the record it is clear why the letter was sent to Peter Road instead of to Maryville. Mr. Cogdill, president of the company, purchased the insurance through Mr. Shipley, Blazer's agent. Mr. Shipley's office was at the Peter Road address and when Mr. Cogdill was trying to get possession of the policies he contacted Mr. Shipley at that address. Since all of Mr. Cogdill's negotiations with reference to the policies were with Mr. Shipley and since he had not been notified by Blazer or Mr. Shipley that Blazer had moved its offices or terminated its relationship with Mr. Shipley, we find no impropriety in the letter's being sent to the Peter Road address.

The trial court, however, took a different view on this issue. In his determination of the case, he said: "The crucial question in this case is whether or not Defendant's notice to Plaintiff's former broker sometime in July, 1987 was effective notice to the Plaintiff to stop the accrual of further and additional premiums. From the proof in this case, the Court respectfully finds that issue in favor of the Plaintiff.

"The undisputed testimony in the case is that Defendant was well aware of the fact that Plaintiff's former broker, Mr. Shipley, was out of state at or about the time Defendant's cancellation notice was sent; the proof further shows that Defendant was acutely aware of the fact that Mr. Shipley's absence from the state of Tennessee was tenuous and dependent upon the fragile physical condition of his ill daughter, hundreds of miles away from Mr. Shipley's office. The proof further shows that after Shipley's initial dealings as a broker between Plaintiff and Defendant, all of the subsequent dealings as between these parties were directly with each other (i.e.: payment of regular premiums due, submission of claims for which Defendant was paid) and not between Defendant and Plaintiff's broker. Plaintiff denies the agency of Shipley at the time Defendant gave the notice in July, 1987; no competent proof was adduced to rebut the non-agency status. Defendant's notice to Plaintiff through Shipley was, therefore ineffective."

We must respectfully disagree with this finding by the trial court because it is not supported by the proof in the record. The proof does show Mr. Shipley had a daughter who was ill. Near the first of July he took her to the Mayo Clinic in Rochester, Minnesota. While there, the daughter's condition worsened, which delayed Mr. Shipley's return until about the middle of July. But there is no evidence in the record that Mr. Cogdill or any of the officers or representatives of Defendant had any knowledge of Mr. Shipley's absence from the state or the illness of his daughter.

We agree with the court's finding that Blazer had terminated Mr. Shipley's agency relationship some two weeks prior to his receiving Cogdill's letter of July 13. However, under the circumstances in the case at bar, since Cogdill had no notice of the termination of Shipley's agency for Blazer, it was justified in continuing to deal with him as Blazer's agent. The landmark case in this jurisdiction addressing the necessity of notice of the termination of an agency relationship to third parties is *Murdock, et al., v. James T. Leath, et al.*, 57 Tenn. (10 Heiskell) 166 (1872). The court quoted with approval from Story on Agency, § 470, as follows:

"In the next place let us consider at what time and under what circumstances the revocation, by the act of the principal, takes effect. And here the rule of our law is equally clear and comprehensive and just. As to the agent himself, subject to what has already been stated, it takes effect from the time when the revocation is made known to him; and as third persons, when it is made known to

them and not before. Until, therefore, the revocation is so made known it is inoperative. If known to the agent as against his principal, his rights are gone; but as to third persons, who are ignorant of the revocation, his acts bind both himself and principal. Indeed, this is but another application of the known maxim of law and equity, that when one of two innocent persons must suffer, he shall suffer who, by his confidence, or silence, or conduct, has misled the others."

Tennessee Jurisprudence explains the reason for the rule in *Murdock* as follows:

This rule is necessary to prevent imposition, and for the safety of the party dealing with the agent. Even if the notice had reached the agent, and he concealed the knowledge of the revocation from the public, and the circumstances attending the revocation were such that the public had no just grounds to presume a revocation, his acts done under his former power would still be binding on his principal. *Murdock v. Leath,* 57 Tenn. (10 Heisk.) 166 (1872).

Tennessee Jurisprudence, Vol. 1, Agency, § 87, Revocation of Authority, p. 433.

American Jurisprudence 2d states the general rule as follows:

With respect to third persons, the principal, as a rule, may revoke the authority of his agent at any time, but the acts of an agent after his authority has been revoked may bind a principal as against third persons who, in the absence of notice of the revocation of the agent's authority, rely upon its continued existence. The general rule is that the acts of an agent, within the apparent scope of his authority, are binding on the principal as against one who formerly dealt with him through the agent and who had no notice of the revocation, because such a person is justified in assuming the continuance of the agency relationship. This is especially so with reference to transactions initiated by the agent before the revocation of his authority, as in the case of persons continuing to deal with purchasing agents. Moreover, the principal may, by reason of his conduct subsequent to the revocation of an agent's authority, be estopped to deny that the agency continued to exist.

3 Am.Jur.2d, Agency, § 52, Notice to third persons, pp. 553–554.

Mr. Shipley, as the agent of Blazer, initiated the sale of the insurance to Cogdill. He also executed the insurance binder issued to Cogdill. When Cogdill inquired about not receiving his policies, Mr. Shipley was the one who assured Mr. Cogdill he was covered and he would get his policies. Since Cogdill was never notified of the termination of the agency relationship, Cogdill was "justified in assuming the continuance of the agency relationship" and Blazer is "estopped to deny that the agency continued to exist."

The judgment of the trial court is modified to fix the liability of Cogdill for premiums on the policies from March 6, 1987, through July 15, 1987, prorated on the regular premium rate instead of the "short rate" basis. The judgment is also modified to such extent as may be necessary to fix the rights and liabilities between the parties which further proceedings may justify. To the extent the judgment is not modified, it is affirmed. The cost of this appeal is taxed to the Appellee. The case is remanded to the trial court for all necessary proceedings and the entry of a judgment in keeping with this opinion.

McMURRAY, J., and INMAN, Special Judge, concur.